Filed 2/20/19

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARCO ESCARCEGA,<br><br>    Defendant and Appellant. | B284215<br><br>Los Angeles County<br>Super. Ct. No. MA069101 |

     APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge. Affirmed.

     Patrick Morgan Ford, for Defendant and Appellant.

     Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb, Ilana Herscovitz Reid, and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1100, 8.1105(b), and 8.1110(a), this opinion is certified for publication with the exception of parts 2, 4, and 5 of the Discussion.

# INTRODUCTION

Defendant Marco Escarcega caused a head-on collision while attempting to pass two vehicles on a two-lane road at night, resulting in catastrophic injuries to two victims. Defendant argues that there is insufficient evidence he acted with wanton disregard for safety; that he was denied his right to present a defense when the court excluded cross-examination questions about other accidents on that stretch of road; that the great-bodily-injury enhancement is unauthorized because great bodily injury is an element of the underlying offense; that the evidence did not support the court's imposition of the high term; and that the court erred by finding defendant presumptively ineligible for probation. We affirm.

## PROCEDURAL BACKGROUND

By information dated November 1, 2016, defendant was charged with one count of reckless driving (Veh. Code, § 23103, subd. (a); count 1).[1] The information also alleged defendant had caused a specified injury to Carlos I. (§ 23105) and personally inflicted great bodily injury on Jessica S. (Pen. Code, § 12022.7, subd. (a)). Defendant pled not guilty and denied the allegations.

After a trial at which he testified in his own defense, the jury convicted defendant of count 1 and found the allegations true. The jury deliberated for just over an hour.

Defendant was sentenced to an aggregate term of six years in state prison—the high term of three years for count 1 (§ 23103/23105) plus three years for the enhancement (Pen. Code,

---

[1] Unless otherwise indicated, all undesignated statutory references are to the Vehicle Code.

§ 12022.7, subd. (a)), to run consecutively. He filed a timely notice of appeal.

## FACTUAL BACKGROUND

**1.    Prosecution Evidence**

**1.1.    Defendant tries to pass two vehicles and crashes into an oncoming car.**

On July 15, 2015, at 9:20 p.m., defendant was driving a 2012 Hyundai Elantra eastbound on Palmdale Blvd. He was on his way to work at Adelanto Detention Facility. That stretch of road has one lane of traffic in each direction and is divided by a broken yellow line. There are no streetlights. The speed limit is 55 miles per hour.

As defendant approached 110th Street, he saw two vehicles ahead of him. Shannon Emery's Chevrolet Monte Carlo sedan was directly in front of him. A large delivery box-truck was in front of Emery. Neither Emery nor defendant could see whether there were any cars in front of the delivery truck, which also blocked their view of any headlights from oncoming traffic. Defendant estimated he was driving 45 miles per hour at this point, but Emery testified that she was going 70 miles per hour.

Though defendant could not see beyond the truck, did not know whether there were more cars in front of it, and could not tell how much space there was between Emery and the truck, he decided to pull into the westbound lane and pass both vehicles. When defendant pulled past Emery and attempted to pass the truck, however, he discovered it was following two or three more cars.

As defendant drew parallel with the delivery truck, he saw headlights coming towards him. The headlights belonged to a

Lexus sedan carrying Jessica, the driver, and her two nephews, Carlos (age five) and Gabriel I. (age four). Jessica was driving about 65 miles per hour in the westbound lane.

Emery, who by this time had seen Jessica's headlights, eased off her gas pedal to allow defendant to pull in front of her. According to his statement to authorities, defendant tried to reenter the eastbound lane in front of Emery, but there wasn't enough room, so he slowed down to retake his original spot. By that point, however, another car had pulled behind Emery, and he couldn't get back in. Defendant swerved onto the left shoulder. Meanwhile, Jessica had seen defendant driving towards her, had made the same decision he did, and swerved toward the same shoulder. The cars collided, and Jessica blacked out briefly at the moment of impact. Emery saw the collision and called 911.

According to California Highway Patrol Officer Nathan Parsons, who testified as an expert on collision reconstruction, defendant had continued to accelerate until two and a half seconds before the collision. Five seconds before the collision, defendant was driving 67 miles per hour. Four seconds before the collision, he was driving 71 miles per hour. Three seconds before the collision, he was driving 73 miles per hour. And though defendant first stepped on his brakes two and a half seconds before the collision, he did not hit them hard enough to engage the Antilock Braking System until one second before impact. At the moment of impact, defendant was driving 42 miles per hour. Jessica was driving approximately 37 miles per hour.

When Jessica regained consciousness, her hands were on the steering wheel. Glass from the shattered windshield had cut her wrists. The engine was on fire. The children were screaming in the back seat. Defendant stumbled out of the passenger side of

his car as Jessica tried to free herself. She yelled for help 10 to 20 times, but defendant just looked at her and walked away. Eventually, bystanders came to her aid, and Jessica and the children were transported to a hospital. Meanwhile, defendant called his fiancée to let her know he had been in an accident.

Defendant was adamant that he had reached the shoulder first and that Jessica was at fault for the crash—but CHP Officer Eduardo Alonzo, who investigated the incident, determined that unsafe passing had caused the collision. Defendant's admission that he could not see the cars in front of the delivery truck—and therefore, did not have a clear view of the opposing lane—strengthened that conclusion.

Nor were either Parsons or Alonzo persuaded by defendant's theory that dips in the road had prevented him from seeing Jessica's headlights. Alonzo, who had driven on the road numerous times, did not consider the depression on the westbound side of Palmdale Blvd. to be significant; it had never caused him to lose sight of oncoming traffic. According to Parsons, who measured the road with a team of engineers, the depression is 2.17 feet deep at its lowest point, which was 270 feet away from the impact site. But Jessica's headlights were higher than that—2.2 feet above ground at the center of the lights and 2.4 feet above ground at the top of the lights.

### 1.2. Jessica and Carlos suffer serious injuries.

Carlos went into hyperemic shock, had a collapsed lung, and was put on life support with a chest tube. He was in a coma for 10 days. He received multiple unsuccessful skin grafts from his legs to his arm, which required his mother to tend to an open wound from his wrist to his elbow. Carlos underwent more than 10 surgeries. He stayed at LAC +USC Medical Center from July

15, 2015, to August 4, 2015. Although he returned home briefly, he ultimately required additional surgeries and another hospital stay. Carlos, who was seven years old at the time of trial, showed the jury the injuries to his chest and legs. The jury also saw photographs of various skin and muscle grafts on his legs, chest, and arm.

Jessica remained in the hospital for three weeks. She had hip, knee, and ankle surgery to repair serious fractures; her ankle had to be "completely reassembled." Jessica suffered additional fractures to her skull, four ribs, sternum, and lower spinal disk, as well as internal bleeding. She was confined to a wheelchair for six months, used a walker for three months, and had to modify her home to accommodate her inability to walk. She testified that she expected to undergo at least one more knee surgery.

**2.    Defense Evidence**

### 2.1.   Defendant's Testimony

Defendant testified on his own behalf. On the evening of July 15, 2015, he was driving to work as a detention officer at the Adelanto Detention Facility. He was supposed to arrive by 10:00 p.m. He was not running late, and there was no traffic. In his experience, that stretch of Palmdale Blvd. was "very straight" and had "little ups and downs" but no "major depressions." He did not know where the depressions were. The road was very dark at night.

As he approached 110th Street, he saw two vehicles in front of him—a pickup truck stacked with items, and a smaller vehicle behind that truck. Defendant was concerned about driving behind the truck because he thought its cargo looked unstable

and some of the items might fall out. He planned to pass the smaller vehicle, and then to pass the truck.

Defendant could not tell whether there were any vehicles in front of the truck and the smaller car because "the truck obscured any other taillights in front of it." When he did not see any lights coming in the opposite direction, he confirmed there was a broken line on the road and moved into the left (westbound) lane to initiate a pass. By the time he caught up to the car and was approaching the truck, however, he discovered that there were three more cars in front of the truck. Then he saw oncoming headlights appear "out of nowhere."

Defendant tried to pull back into the right (eastbound) lane between the truck and smaller car, but there wasn't enough room. He slowed down and tried to move back into his original position, but by then, another car had pulled closer to the smaller car and "it was too dangerous" to move over. Defendant decided to move onto the left shoulder to allow the oncoming traffic to pass. But while he was on the shoulder, the car coming toward him swerved off the road and collided into him.

After the collision, defendant got out of his car using the passenger door. He saw Jessica crying and thought she might have been saying something, but he couldn't hear her through the window. He couldn't help her because he couldn't walk. He tried to tell a bystander to help her, but he couldn't speak.

### 2.2. Expert Testimony

Brad Avrit, president of Wexco International Corporation, conducted an accident investigation. He recreated the location of each vehicle based on its speed and the location of the impact to show why the drivers did not see each other earlier. Avrit concluded that the drivers' headlights had been at the same

elevation for only three and a half to four seconds, which left the drivers only one and a half to two seconds to perceive the threat and try to avoid a crash.

Avrit prepared a video for the jury that purported to demonstrate the problem by reenacting defendant's view of the oncoming headlights. Footage was taken by a camera placed on a stationary tripod at defendant's approximate eye level in the Hyundai. The video demonstrated that defendant had no view of oncoming headlights for approximately eight to 13 seconds where the road dipped to the lower elevation. The same phenomenon occurred for drivers traveling in the opposite direction.

Avrit opined that it was legal to pass on that stretch of Palmdale Blvd. because there were no "do not pass" signs, and there was a dotted line on the road. But where there is a "site obstruction" without any warning signs or solid yellow lines, he opined, it is "considered a trap."

On cross-examination, Avrit conceded that the Google Earth images on which he relied included a disclaimer that "Google makes no claims to the accuracy of coordinates in Google Earth." He also admitted that he did not take survey measurements of the road's elevation. Nevertheless, he testified that the Google Earth data was accurate "to a reasonable degree of engineering certainty" based on what he observed with his "own two eyes."

### 3. Rebuttal Evidence

Parsons, the CHP expert, testified again on rebuttal. He explained that he did not rely on data from Google Earth because its reliability was unknown. He was concerned about the accuracy of Avrit's measurements because Google Earth elevations are rounded to the nearest foot. And indeed, Parsons's

8

physical measurements of the road revealed a 200-foot error in Avrit's calculations. The depression was 673 feet long, not 860 feet, and it was 270 feet away from the area of impact.

Parsons also had concerns about the defense video. He noted that though Avrit set the camera on a 24-inch tripod to account for defendant's eye height, Avrit hadn't accounted for the height of the car. Thus, the camera was set too low and the video showed less of the road than defendant would have seen. The Highway Design Manual, by contrast, conducts its visibility studies using a height of three and a half feet.

## CONTENTIONS

Defendant contends: (1) there is insufficient evidence he acted with wanton or reckless disregard for safety; (2) he was denied the right to present a defense when the court would not allow him to cross-examine a CHP officer about the details of other accidents on Palmdale Blvd.; (3) the great-bodily-injury enhancement is unauthorized because great bodily injury is an element of the underlying offense; (4) the evidence does not support the court's decision to impose the high term; and (5) the court erred by finding him presumptively ineligible for probation.

## DISCUSSION

### 1.    Substantial evidence supports defendant's conviction.

A criminal defendant may not be convicted of any crime or enhancement unless the prosecution proves every fact necessary for conviction beyond a reasonable doubt. (U.S. Const., 5th & 14th Amends.; see Cal. Const., art. I, §§ 7, 15; *In re Winship* (1970) 397 U.S. 358, 364.) "This cardinal principle of criminal jurisprudence" (*People v. Tenner* (1993) 6 Cal.4th 559, 566) is so

fundamental to the American system of justice that criminal defendants are always "afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts" (*United States v. Powell* (1984) 469 U.S. 57, 67).

Defendant contends there is insufficient evidence to support the wanton disregard element of reckless driving because he was on a stretch of road that allowed passing, and since he could not see around the truck he sought to pass, and the depressions in the road blocked his view of oncoming headlights, he did not realize he couldn't pass safely until he had already pulled into oncoming traffic. "This," he insists, "could have happened to anyone in his situation." We disagree.

### 1.1.  Standard of Review

In assessing the sufficiency of the evidence, we review the entire record to determine whether *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid*.)

In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We may not reweigh the evidence or resolve evidentiary conflicts. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The same standard applies where the conviction rests primarily on circumstantial evidence. (*People v. Thompson* (2010) 49 Cal.4th

79, 113.) In short, we may not reverse a conviction for insufficient evidence unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [it].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### 1.2.   Elements of Reckless Driving

To convict a defendant of reckless driving, the People must prove beyond a reasonable doubt that:

- ◦   the defendant drove a vehicle on a highway;[2] and

- ◦   the defendant intentionally drove with wanton disregard for the safety of persons or property.

(§ 23103; see CALCRIM No. 2200.) "A person acts with *wanton disregard for safety* when (1) he or she is aware that his or her actions present a substantial and unjustifiable risk of harm, and (2) he or she intentionally ignores that risk." (CALCRIM No. 2200.)

### 1.3.   There is substantial evidence defendant acted with wanton disregard for safety.

Defendant emphasizes that passing was legally permitted on that stretch of Palmdale Blvd. and insists it was proper for him to move into the left lane without being able to see beyond the delivery truck. He is mistaken.

Section 21650 provides, "Upon all highways, a vehicle shall be driven upon the right half of the roadway, except as follows: [¶] (a) When overtaking and passing another vehicle proceeding in the same direction under the rules governing that movement."

_____

[2] A *highway* is any place "publicly maintained and open to the use of the public for purposes of vehicular travel," including a street. (§ 360.)

11

In turn, under section 21751, "On a two-lane highway, no vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless the left side is clearly visible and free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction." Likewise, the "driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left at a safe distance without interfering with the safe operation of the overtaken vehicle … ." (§ 21750, subd. (a).) And, "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety … ." (§ 22107.)

Taken together, these statutes make clear that a broken line on a roadway does not make passing legal: passing is *only* legal if it is *safe*. And passing is not safe unless a driver, before attempting to pass another car, can see that the left lane is free from traffic and that there is enough room in the right lane to overtake the slower vehicle without cutting it off.

That's why the California Driver Handbook published by the Department of Motor Vehicles warns drivers to "[a]void passing other vehicles … on two-lane roads; it is dangerous. Every time you pass, you increase your chances of having a collision." (Dept. Motor Vehicles, Cal. Driver Handbook (Aug. 2018) p. 66 <https://www.dmv.ca.gov/web/eng_pdf/dl600.pdf> [as of Feb. 14, 2019]; see, e.g., *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 218, fn. 1 (dis. opn. of Kennard, J.) [noting that the Driver Handbook recommends motorists reduce speed by 5–10 miles per hour on wet roads]; *Burg v. Municipal Court* (1983) 35

12

Cal.3d 257, 272 [citing charts in Driver Handbook for principle that drivers know the approximate number of drinks required to exceed maximum BAC].) In particular, the Handbook cautions, "Do not pull out to pass unless you know you have enough space to pull back into your lane." (Driver Handbook, at p. 65.) And: "Do not count on having enough time to pass several vehicles at once or that other drivers will make room for you." (*Id.*, at p. 66.) The Handbook also emphasizes: "**Do not pass:** [¶] If you are approaching a hill or curve and cannot see if other traffic is approaching." (*Id.*, at p. 65.) Finally, the Handbook warns: "Drive more slowly at night because you cannot see as far ahead and you will have less time to stop for a hazard." (*Id.*, at p. 82.) Indeed, this last point was consistent with Parsons's testimony that it takes longer for a driver to perceive and react to hazards at night than during the day.

Here, the delivery truck blocked defendant's view of the entire right lane and at least part of the left lane. He simply had no idea whether it would be safe to pass—and yet he nevertheless pulled into the left lane on a dark but apparently busy road and, driving 70 miles per hour, tried to pass two vehicles at once. The jurors, at least some of whom were presumably licensed drivers, were undoubtedly familiar with basic principles of traffic safety and could reasonably infer that by ignoring them, defendant acted with wanton disregard for the safety of others. (*De Young v. Haywood* (1956) 139 Cal.App.2d 16, 19 ["these rules of the road are merely descriptive of practices that have long been recognized throughout the country and are known to everyone of sufficient judgment and experience to act as a competent juror"].)

Furthermore, Emery testified that she made room for defendant to return to the right lane but he did not try to slow

down. According to Parsons, defendant continued to accelerate until two and a half seconds before the collision. The jury could have reasonably inferred from this testimony that when defendant saw Jessica's headlights, he still had enough time and space to return to his lane ahead of Emery but nonetheless still tried to pass the truck. Taken together, a reasonable jury could conclude from these facts that defendant's conduct went beyond mere carelessness.

Accordingly, we conclude there is sufficient evidence defendant acted with reckless disregard for safety.

2. **The court's evidentiary ruling did not deny defendant the right to present a defense.**

Defendant contends he was denied his constitutional right to present a defense when the court barred him from cross-examining a CHP officer about the details of other accidents near the collision site. The People argue the court properly excluded the testimony on hearsay grounds. We find no constitutional violation.

### 2.1. Proceedings Below

On direct examination, CHP Officer Alonzo testified that unsafe passing caused the collision in this case. He also opined that the stretch of Palmdale Blvd. where the crash occurred had a natural depression—but the depression was not significant and he had never personally lost sight of oncoming traffic because of it.

On cross-examination, counsel elicited the following testimony:

14

Q. Now, you stated that you went back to the location and … you could see a depression east of the accident location of the roadway.

A. A natural depression, yes.

Q. Okay. Now, did you determine what the source of that depression was?

A. It's just the way the ground is. There's a creek that runs naturally through there sometimes, depending on the rain.

Q. And, at least in part, that—there's that depression. Vehicles coming west—if you're traveling eastbound, you could see—at least see part of the vehicle disappearing behind that depression?

A. In my opinion, no. I've been out there numerous times, and I've never lost sight of a vehicle.

[¶] … [¶]

Q. Are you—are you familiar if there had been any other accidents at that particular location at night?

A. In that specific area?

Q. That area.

A. Within that area, yes.

Q. Okay. Are you familiar with any other prior head-on collisions in that area?

At this point, the court called the attorneys to sidebar and asked defense counsel where he was going with his questioning.

Counsel replied, "I was going to ask if he ever investigated other accidents, if anyone ever said something similar, that they couldn't see."

The prosecutor responded, "That would be hearsay." The court agreed and noted that whether other people told Alonzo that they could not see oncoming traffic did not appear to be relevant to Alonzo's opinion that he could always personally see oncoming traffic when driving on that stretch of road. Accordingly, the statements counsel wished to elicit were not relevant to impeach Alonzo's opinion testimony.

At that point, defense counsel withdrew the question and continued cross-examining Alonzo.

### 2.2. Legal Standard

"Under the due process guarantees of the Fourteenth Amendment to the United States Constitution, a criminal defendant has the right to testify on his or her own behalf. [Citations.] These constitutional due process guarantees include the right to present witnesses and evidence in support of a defense. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302.) As the high court has explained, however, these rights are 'subject to reasonable restrictions.' (*United States v. Scheffer* (1998) 523 U.S. 303, 308; see *Chambers*, at p. 302 [noting that a defendant 'must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence'].) [¶] 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' [Citations.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 218, cert. denied *sub nom. Mickel v. California* (2017) __ U.S. __ [137 S.Ct. 2214, 198 L.Ed.2d 661].)

"A defendant's interest in presenting such evidence may thus ' "bow to accommodate other legitimate interests in the criminal trial process." ' [Citations.] As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' [Citations.]" (*United States v. Scheffer*, *supra*, 523 U.S. at p. 308.)

### 2.3. Defendant has not established error.

Defendant contends the court's ruling "was erroneous as the evidence was relevant and admissible under state law, and its exclusion violated appellant's constitutional right to present evidence in his defense." While he explains the relevance of the evidence, however, he does not address its admissibility—that is, he does not explain why the court's ruling was wrong.

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Although a trial court enjoys broad discretion in determining the relevance of evidence [citation], it lacks discretion to admit evidence that is irrelevant [citations] or excluded under constitutional or statutory law (e.g., Evid. Code, § 1200, subd. (b))." (*People v. Morrison* (2004) 34 Cal.4th 698, 724.)

Hearsay is an out-of-court statement offered for the truth of the matter asserted in the statement. (Evid. Code, § 1200, subd. (a).) "Thus, a hearsay statement is one in which a person

17

makes a factual assertion out of court and the proponent seeks to rely on the statement to prove that assertion is true. Hearsay is generally inadmissible unless it falls under an exception. (Evid. Code, § 1200, subd. (b).)" (*People v. Sanchez* (2016) 63 Cal.4th 665, 674; Evid. Code, § 1202 [exception required for each level of hearsay].) On the other hand, an out-of-court "statement 'offered for some purpose other than to prove the fact stated therein is not hearsay.' [Citations.]" (*Sanchez*, at p. 674.)

Here, defense counsel planned to ask Alonzo whether anyone involved in another head-on collision in the area told him that a depression in the road kept them from seeing oncoming traffic. To answer, Alonzo would have had to testify to out-of-court statements—statements that would only be relevant if they were true. Accordingly, the proffered evidence was hearsay.

In his reply brief, defendant appears to concede this point. He suggests, however, that "the statements of others were not necessary, and the evidence could have been presented from business records collected by the investigators at the California Highway Patrol. [Citation.] There can be no real doubt that the highway patrol has records of all head-on collisions on the state's highways." Certainly, counsel could have explored those options—but he didn't.

The rules of evidence are not self-executing. "The proponent of proffered testimony has the burden of establishing its relevance, and, if the testimony [comprises] hearsay, the foundational requirements for its admissibility under an exception to the hearsay rule. [Citations.] Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence. [Citations.]" (*People v. Morrison, supra*, 34 Cal.4th at p. 724.)

Here, defendant did not identify an exception to the hearsay rule or suggest a non-hearsay theory of admissibility. (*Ibid*.) Counsel did not establish the existence of the hypothesized business records or speculate about what they said. Accordingly, defendant has forfeited the issue. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1177–1178 [defendant did not demonstrate error on appeal where trial counsel failed to establish foundation for asserted hearsay exception].)

Nor do we find constitutional error in the exclusion of this evidence under *Chambers v. Mississippi*, *supra*, 410 U.S. 284 and its progeny. "The high court has never suggested these decisions abrogated 'the respect traditionally accorded to the States' in formulating and applying reasonable foundational requirements. [Citations.] '[F]oundational prerequisites are fundamental to any exception to the hearsay rule. [Citations.]' [Citation.] 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' [Citation.] Defendant has failed to demonstrate any infringement, particularly since all of the excluded evidence would only have served to corroborate other testimony informing the jury of the same or comparable facts." (*People v. Ramos*, *supra*, 15 Cal.4th at p. 1178.)

### 3.    A great-bodily-injury enhancement may attach to felony reckless driving.

Penal Code section 12022.7 (hereafter Section 12022.7) provides for a three-year sentence enhancement when a defendant personally inflicts great bodily injury on a non-accomplice in the commission of a felony. (Pen. Code, § 12022.7, subd. (a).) But the statute specifically exempts murder, manslaughter, arson, and any crime in which "infliction of great

19

bodily injury is an element of the offense." (*Id.*, subd. (g).) Defendant argues subdivision (g) bars the enhancement imposed here because great bodily injury is an element of the "offense" of reckless driving causing an enumerated injury (§ 23105) even though that "offense" named Carlos as the victim and the enhancement named Jessica.

As a matter of first impression, we conclude section 23105 is not a substantive offense because it does not define a criminal act. Instead, it is a sentencing provision that allows particularly serious forms of reckless driving to be punished as felonies rather than misdemeanors. Because great bodily injury is not an element of the substantive offense of reckless driving (§ 23103), the prohibition in Section 12022.7, subdivision (g), does not apply.[3]

### 3.1.    Relevant Statutes

As discussed, to convict a defendant of reckless driving under section 23103, the prosecution must prove:

- the defendant drove a vehicle on a highway; and

- the defendant intentionally drove with wanton disregard for the safety of persons or property.

Under the statute, "except as provided in Section 23104 or 23105," a defendant "convicted of the offense of reckless driving" may be sentenced to between five and 90 days in county jail, a fine of between $145 and $1,000, or both. (§ 23103, subd. (c).)

---

[3] Defendant does not argue that the enhancement should have been stricken or stayed under some other statutory provision, and we express no opinion on that subject.

That is, "except as provided in Section 23104 or 23105," reckless driving is a misdemeanor.

Section 23104 lengthens a defendant's sentence "whenever reckless driving of a vehicle proximately causes bodily injury to a person other than the driver … ." If the defendant is a first-time offender, he is subject to a misdemeanor term of between 30 days and six months in county jail, a fine of between $220 and $1,000, or both. (§ 23104, subd. (a).) If the defendant has previously been convicted of reckless driving, engaging in a speed contest (§ 23109), or driving under the influence (§ 23152), however, the offense becomes a wobbler.[4]

Finally, under section 23105, a "person convicted of reckless driving in violation of section 23103 that proximately causes one or more" enumerated serious injuries is subject to the same punishment as a recidivist offender. That is, the offense becomes a wobbler.

Here, defendant was charged with one count of reckless driving (§ 23103, subd. (a)). As to that count, the information alleged he had proximately caused an enumerated injury to Carlos, which elevated the offense to a felony under section 23105. Then, as to the same count, the information alleged that he personally inflicted great bodily injury on Jessica under Section 12022.7, subdivision (a). The jury convicted defendant of reckless driving and found both allegations true. We are asked to

---

[4] Wobblers are a "special class of crimes" that "are chargeable or, in the discretion of the court, punishable as either a felony *or* a misdemeanor; that is, they are punishable either by a term in state prison or by imprisonment in county jail and/or by a fine." (*People v. Park* (2013) 56 Cal.4th 782, 789.)

decide whether defendant's subsequent sentence is authorized under Section 12022.7, subdivision (g).

### 3.2. Standard of Review

Section 12022.7, subdivision (g)'s application to the reckless driving statutes is an issue of "statutory interpretation that we must consider de novo." (*People v. Prunty* (2015) 62 Cal.4th 59, 71.) As with any case involving statutory interpretation, our primary goal is to ascertain and effectuate the lawmakers' intent. (*People v. Park, supra*, 56 Cal.4th at p. 796.) To determine intent, we "examine the ordinary meaning of the statutory language, the text of related provisions, and the overarching structure of the statutory scheme." (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1246; *id.* at p. 47, citing *Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1391 (conc. opn. of Cuéllar, J.) [" 'The statute's structure and its surrounding provisions can reveal the semantic relationships that give more precise meaning to the specific text being interpreted, even if the text may have initially appeared to be unambiguous' "].)

Though we focus on the text itself, we "must also consider 'the object to be achieved and the evil to be prevented by the legislation. [Citations.]' [Citation.]" (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276.) We " 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" (*People v. Coronado* (1995) 12 Cal.4th 145, 151.) " 'Thus, "[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." [Citation.]' " (*Horwich*, at p. 276.)

### 3.3. Great bodily injury is not an element of reckless driving.

By its terms, Section 12022.7, subdivision (g), applies only to murder, manslaughter, arson, or when "infliction of great bodily injury is an element of the offense." Since defendant was not charged with murder, manslaughter, or arson, we must first determine whether great bodily injury is an "element of the offense" charged in this case. We conclude it is not. As we explain in detail below, section 23105 is a sentencing provision that mandates an alternate, elevated base term for defendants convicted of particularly serious forms of reckless driving. But the relevant *offense* is reckless driving under section 23103—and infliction of great bodily injury is not an element of that offense. Therefore, subdivision (g) does not apply.

### 3.3.1. Substantive Crimes and Punishment Statutes

"Provisions describing substantive crimes … generally define criminal *acts*." (*People v. Ahmed* (2011) 53 Cal.4th 156, 163.) Sentence enhancements and alternate penalty provisions, on the other hand, "increase the punishment for those acts. They focus on *aspects* of the criminal act that are not always present and that warrant additional punishment." (*Ibid.*; *People v. Dennis* (1998) 17 Cal.4th 468, 500–502.) Though these statutes can resemble substantive offenses insofar as they impose additional punishment based on a factual finding that a defendant engaged in certain conduct while committing a crime, because the statutes "do not define criminal acts," they are not separate offenses. (*Ahmed*, at p. 163.) A penalty provision differs from a substantive offense in that it "is separate from the underlying offense and does not set forth elements of the offense or a greater degree of

23

the offense charged. [Citations.]" (*People v. Bright* (1996) 12 Cal.4th 652, 661, overruled on other grounds by *People v. Seel* (2004) 34 Cal.4th 535.)

Likewise, though sentence enhancements and penalty provisions serve similar functions, the "difference between the two is subtle but significant." (*People v. Jones* (2009) 47 Cal.4th 566, 578.) A sentence enhancement is "an *additional term* of imprisonment added to the base term." (Cal. Rules of Court, rule 4.405(3), italics added.) A penalty provision, on the other hand, " 'sets forth an alternate penalty *for the underlying felony itself*, when the jury has determined that the defendant has satisfied the conditions specified in the statute.' [Citation.]" (*Jones*, at p. 578.) It usually does so either by allowing a misdemeanor to be punished as a felony under the Determinate Sentencing Law or by removing a crime *from* the DSL and bringing it under an alternative sentencing scheme such as the Three Strikes law. Thus, we can most easily identify a penalty provision by contrast to what it isn't: an enhancement or a substantive offense.

### 3.3.2.   Plain Meaning and Statutory Structure

A statute is more likely to be a sentencing provision than a substantive offense when it identifies circumstances that elevate the punishment for a crime defined in a different statute.

For example, in *Robert L.*, the Supreme Court held that Penal Code section 186.22, subdivision (d), is an alternate penalty provision because it "provides for an alternate sentence when it is proven that the underlying offense has been committed for the benefit of, or in association with, a criminal street gang." (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 899 (*Robert L.*).) Though the statute "prescribes an alternate penalty when the underlying offense is committed under specified

24

circumstances," it is not a "substantive offense because it does not define or set forth elements of a *new crime*. [Citation.]" (*Id.* at pp. 899–900, italics added.)

Likewise, in *Bouzas*, the Supreme Court held that Penal Code section 666, petty theft with prior, was a sentencing provision, not a substantive offense, because it was structured to increase "the punishment for a violation of other defined crimes and not to define an offense in the first instance. [Penal Code section 666] simply refers to other substantive offenses defined elsewhere" and states that a defendant previously convicted of one of those offenses is subject to greater punishment than a first-time thief. (*People v. Bouzas* (1991) 53 Cal.3d 467, 478–479.)

Section 23105 operates the same way. It states: "A person convicted of reckless driving in violation of Section 23103 that proximately causes one or more of the injuries specified in subdivision (b) to a person other than the driver, shall be punished by imprisonment" as either a felon or a misdemeanant. (§ 23105, subd. (a).) Thus, like the statutes at issue in *Robert L.* and *Bouzas*, section 23105 first references a substantive offense defined elsewhere—"reckless driving in violation of Section 23103"—then identifies conditions under which that act may be punished as a felony: when a "person … proximately causes one or more of the injuries specified in subdivision (b) … ." (See *People v. Weathington* (1991) 231 Cal.App.3d 69, 89 [holding that § 23175 (DUI with prior) is a penalty provision where it "describes the conduct that constitutes the crime as 'a violation of section 23152' "], cited with approval in *People v. Coronado, supra*, 12 Cal.4th at p. 152, fn. 5.)

The structure of the reckless driving statute itself supports this view. In section 23103, subdivision (a) defines a criminal act:

"A person who drives a vehicle upon a highway in willful or wanton disregard for the safety of persons or property is guilty of reckless driving." Then, subdivision (c) establishes the punishment for that act: "persons convicted of the offense of reckless driving shall be punished" as misdemeanants, "except as provided in Section 23104 or 23105." Notably, the punishment subdivision of section 23103 expressly refers to section 23105— but the subdivision defining the criminal act does not.

If statutory " 'language is unambiguous, there is no need for further construction.' " (*People v. Gonzales* (2017) 2 Cal.5th 858, 868.) Based on the plain meaning and structure of these statutes, section 23105 is not a substantive offense. And though section 23103 *is* a substantive offense, great bodily injury is not an element of that offense. Accordingly, great bodily injury cannot be "an element of the offense" in this case within the meaning of Section 12022.7, subdivision (g).

We are mindful, however, that in arguing Section 12022.7, subdivision (g), applies here, defendant relies heavily on *Beltran*, in which the court of appeal reversed a Section 12022.7 enhancement after concluding "great bodily injury is an element of the felony offense of evading a pursuing peace officer." (*People v. Beltran* (2000) 82 Cal.App.4th 693, 697.) As relevant to that case, section 2800.3 provided that a person convicted of evading a peace officer under section 2800.1 could be punished as a felon if he proximately caused death or serious bodily injury. *Beltran* focused on whether "great bodily injury" under Section 12022.7, subdivision (g), encompassed the "serious bodily injury" referred to in section 2800.3. (*Beltran*, at pp. 696–697.) But while it acknowledged section 2800.1 was a sentencing provision, the court did not explain why, in its view, serious bodily injury was

26

nevertheless an "element of the offense" for enhancement purposes. (*Beltran*, at pp. 696–697.) Certainly, opinions are not authority for propositions not considered therein (e.g., *People v. Bailey* (2018) 27 Cal.App.5th 376, 385), but *Beltran*'s failure to address this point may also indicate some latent statutory ambiguity that isn't apparent from the plain text.

To resolve any ambiguity, we turn to legislative history. (See *People v. Bright, supra*, 12 Cal.4th at pp. 662–669 [when construing a provision as a penalty provision or a substantive offense, examination of legislative intent is particularly important because of the broad consequences that follow].)

### 3.3.3. Legislative Purpose

Here, section 23105's history is consistent with its plain meaning: the Legislature enacted a penalty provision. (See *People v. Garcia* (1998) 63 Cal.App.4th 820, 829–832 [based on legislative history, statute increasing term for second degree murder when killing is committed by shooting from a vehicle was a penalty provision, not a substantive crime]; *People v. Weathington, supra*, 231 Cal.App.3d at p. 89 [based on legislative history, it "is clear the purpose of the repeat offender provisions of the 'drunk driving' statutes historically has been to specify penalties rather than to define the crime"].) To understand why, we must consider the problem of street racing in the early aughts.

In the wake of the 2001 summer blockbuster *The Fast and the Furious* (Universal Pictures 2001), a series of deaths galvanized law enforcement to crack down on local street-racing enthusiasts and served as a catalyst for new legislation designed to deter the activity. (Clar, *Chapter 411: Putting the Brakes on the Dangerous Street Racing Phenomenon in California* (2003) 34

27

McGeorge L.Rev. 372, 373–374; Worrall & Tibbetts, *Explaining San Diego's Decline in Illegal Street-Racing Casualties* 23 Just. Q. (2006) pp. 530, 531–535 [describing municipal government and local law enforcement responses].) At the urging of a coalition of East Bay cities, the Legislature responded with urgency legislation during its 2001–2002 session that allowed police to impound the car of anyone they arrested for street racing—and to hold the car for 30 days. (*Clar*, *supra*, at pp. 379–381; Stats. 2002, ch. 411, § 2, p. 2343; Assem. Com. on Transportation, Analysis of Sen. Bill No. 1489 (2001–2002 Reg. Sess.) as amended Apr. 24, 2002, pp. 3–4.)

During the 2003–2004 session, lawmakers expanded the collateral consequences of street racing again—this time by requiring the DMV to revoke offenders' licenses (Stats. 2004, ch. 595, § 2)—but efforts to increase the penal consequences for the crime stalled. Assembly Bill No. 985 would have made street racing (§ 23109) a wobbler whenever it caused great bodily injury—even for a first-time offender.[5] The bill died in committee amidst concerns that the new penalties would exceed those for reckless driving.[6] (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 985 (2003–2004 Reg. Sess.) as amended Apr. 2, 2003,

---

[5] We use *street racing* and *engaging in a speed contest* synonymously.

[6] As section 23105 had not yet been enacted, the maximum penalty for reckless driving then appeared in section 23104. As discussed, section 23104 increases penalties for reckless drivers who injure others. If the defendant is a first-time offender, he is subject to a longer misdemeanor sentence. (§ 23104, subd. (a).) If the defendant causes great bodily injury *and* has previously been convicted of reckless driving, engaging in a speed contest (§ 23109), or driving under the influence (§ 23152), however, the offense becomes a wobbler. (§ 23104, subd. (b).)

pp. 2, 6.) Assembly Bill Nos. 1314 and 2440, which would have increased penalties for recidivist street racers who proximately caused *any* injury, also died in committee. Critics felt existing penalties for reckless driving were sufficient, and they were skeptical about the need for competing penalties for a similar offense. (See Assem. Com. on Appro., Analysis of Assem. Bill No. 2440 (2003–2004 Reg. Sess.) as amended Apr. 12, 2004, p. 2.)

So, in the 2005–2006 legislative session, advocates adopted a two-step approach. First, the Legislature amended the street-racing law (§ 23109) to increase the penalties for street-racing *recidivists*, making the penalties equivalent to those already available for reckless driving under section 23104. (Assem. Bill No. 1325 (2005–2006 Reg. Sess.) § 1; Stats. 2005, ch. 475, § 1.) "Part of the rationale for creating the enhanced penalties on a second offense was that the concern was not with the person who gets caught reckless driving or in a speed contest on a first time bad decision situation but [rather] those who participate regularly in speed contests and other similar events. The provisions … were intended to go after those repeat offenders who continue to offend even when caught." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 2190 (2005–2006 Reg. Sess.) as amended Apr. 20, 2006, p. 7; accord, Gov. Off. of Planning and Research, Enrolled Bill Rep. on Assem. Bill No. 1325 (2005–2006 Reg. Sess.) Sept. 19, 2005, p. 1 ["This bill would help reduce street racing by targeting repeat offenders who cannot plead ignorance about the consequences of their actions. These offenders know about the numerous crashes, injuries and fatalities yet they still choose to put themselves and others at risk with their unlawful behavior. AB 1325 will help deter repeat offenders by increasing the penalties for a second offense and will

send the message to all street racers that California is serious about punishing participants in these deadly games."].)

Next, once the new recidivist penalties went into effect, the broader measure was reintroduced—but this time it amended *both* the reckless driving law and the street-racing statute. (Assem. Bill No. 2190 (2005–2006 Reg. Sess.) as introduced Feb. 22, 2006 [hereafter A.B. 2190].) As introduced, A.B. 2190 deleted the prior-conviction requirements of sections 23104 (reckless driving wobbler) and 23109 (street racing) and provided instead that *any* defendant—including a first-time offender—who proximately caused *any* injury could be subject to a felony.

Though an Assembly amendment limited the expanded punishment to offenders who caused great bodily injury (Assem. Amend. to A.B. 2190 (2005–2006 Reg. Sess.) Apr. 20, 2006), the Senate Public Safety Committee was still not convinced that first-time reckless drivers and street racers should be eligible for felony punishment—particularly since no one knew whether the last round of statutory changes had made any impact. (Sen. Com. on Public Safety, Analysis of A.B. 2190, *supra*, pp. 8–10.)

To address these concerns, the Senate made several changes to the bill. First, it amended the bill to express the Legislature's intent that "only the most egregious violations" should be charged as felonies. (Sen. Amend. to A.B. 2190 (2005–2006 Reg. Sess.) June 26, 2006.) Then, apparently concluding this expression of intent did not do enough to limit felony eligibility, the Senate rewrote the bill. (Sen. Amend. to A.B. 2190 (2005–2006 Reg. Sess.) Aug. 23, 2006.)

Rather than changing the existing statutes, the final version created two new provisions—section 23105 for reckless driving and section 29109.1 for street racing—and listed precise

injuries a first-time offender needed to cause to warrant felony punishment. Not all great bodily injury would qualify. Instead, the defendant must proximately cause: loss of consciousness, concussion, a bone fracture, a protracted loss or impairment of function of a bodily member or organ, a wound requiring extensive suturing, a serious disfigurement, brain injury, or paralysis. (§ 23105, subd. (b).)

These negotiations reveal that the Legislature was focused on increasing punishment for existing crimes and the circumstances under which such punishment would be appropriate. There is no indication that lawmakers suspected they would be creating an entirely new criminal offense.

### 3.3.4.  Absurd Consequences

Nor does treating section 23105 as a sentencing provision lead to absurd consequences that the Legislature could not possibly have intended.

If section 23105 is a sentencing provision, a defendant who drives recklessly may be charged with only one count of reckless driving—regardless of how many people he injures—because he has committed only one criminal act. Yet he is also subject to a great-bodily-injury enhancement for each otherwise unaccounted-for victim. (*People v. Oates* (2004) 32 Cal.4th 1048.) If section 23105 is a substantive offense, on the other hand, each infliction of great bodily injury represents a distinct criminal act—so a defendant whose driving injures multiple people may be charged with as many counts of reckless driving as there are injured victims. (*People v. Cook* (2015) 60 Cal.4th 922, 934–937 (*Cook*).)[7]

---

[7] In examining vehicular manslaughter in *Cook*, the Supreme Court held that section 12022.7, subdivision (g), did not apply to

To illustrate the difference, imagine, for example, that the defendant in this case, a first-time offender, had collided with a gasoline tanker instead of a passenger sedan and had seriously injured 50 people rather than two. If section 23105 is a sentencing provision, defendant would be charged with one count of felony reckless driving—one strike offense for his one act of criminal recklessness—and 49 enhancements for the 49 other people he hurt. But if section 23105 is a substantive offense, defendant would be charged instead with 50 counts of reckless driving causing great bodily injury—50 strikes for his one act of criminal recklessness.

The Legislature plainly did not contemplate such a result. As enacted, section 23105 was conduct-focused—not victim-specific. The purpose of the bill was to "increase traffic safety by reducing the number of drivers engaging in motor vehicle speed contests and reckless driving." (Bus., Trans., and Housing Agency, Enrolled Bill Rep. on Assem. Bill No. 2190 (2005–2006 Reg. Sess.) Sept. 5, 2006, p. 1; accord, e.g., *id.*, at pp. 2–3 [describing penalties]; Off. of Planning and Research, Enrolled Bill Rep. on Assem. Bill No. 2190 (2005–2006 Reg. Sess.) Aug. 29, 2006, p. 2 ["Stiff penalties are crucial in order for law

---

manslaughter even if the enhancement involved injuries to a different victim than the victim of the substantive offense. (*Cook, supra*, 60 Cal.4th at p. 936.) Nevertheless, it found "nothing absurd in charging and punishing a defendant separately for whatever crimes that defendant committed against separate victims." (*Ibid.*) Thus, the "prosecution can charge a defendant for each manslaughter the defendant committed and, if appropriate, for crimes committed against surviving victims, and the court can sentence the defendant for each crime against separate victims for which the defendant is convicted to the extent the sentencing laws permit." (*Ibid.*)

enforcement to curb the very dangerous problem of reckless driving and drag racing. … This bill seeks to deter this highly dangerous behavior by increasing penalties"].)

As discussed above, the list of injuries was added to the bill to narrow its scope to address the Senate's concerns about whether a first offense for reckless driving should *ever* be treated as a wobbler. As such, the injuries represented an objective measure of seriousness—a Legislative determination of the circumstances under which reckless driving is egregious enough to warrant a felony sentence for a first-time offender. Treating the provision as a substantive offense would undermine that intent by subjecting a first-time offender to multiple felonies rather than just one.

We recognize that our interpretation of section 23105 could lead to sentencing disparities wherein defendants convicted of multiple counts of vehicular manslaughter receive shorter aggregate terms than defendants convicted of a single count of reckless driving with multiple great-bodily-injury enhancements. (See *Cook*, *supra*, 60 Cal.4th at pp. 936–938.) Yet "it appears that no interpretation of [S]ection 12022.7, subdivision (g), is guaranteed to eliminate all possible anomalies." (*Id.* at p. 938; see, e.g., *Harmelin v. Michigan* (1991) 501 U.S. 957, 998–1001 (conc. opn. of Kennedy, J.) [noting inevitable sentencing vagaries].) Nor is the disparity substantial enough to warrant a different statutory construction. (See *California School Employees Assn. v. Governing Bd. of South Orange County Community College Dist.* (2004) 124 Cal.App.4th 574, 588 ["We must exercise caution using the 'absurd result' rule; otherwise, the judiciary risks acting as a ' "super-Legislature" ' by rewriting statutes to find an unexpressed legislative intent."].)

Because section 23105 is not a substantive offense and great bodily injury is not an element of section 23103, we conclude Section 12022.7, subdivision (g), does not apply. Accordingly, defendant's sentence is authorized.

## 4. The court properly imposed the high term.

Defendant contends the evidence did not support the court's decision to impose the high term in this case. His claim is premised on an outdated version of the Determinate Sentencing Law, and we find no abuse of discretion.

### 4.1. The issue is cognizable on appeal.

The People contend defendant has forfeited this claim by failing to object to the court's sentencing choices below. We disagree.

Defense counsel filed a sentencing brief that listed mitigating factors supporting a grant of probation, included letters seeking leniency, and attached evidence of defendant's work history and current health problems; arranged for in-court statements from character witnesses; and argued at the sentencing hearing that the maximum six-year term was too high. Counsel's arguments made it clear that defendant objected to imposition of the high term in this case. Because the trial court was fully apprised of defendant's contention that a six-year prison term was inappropriate—and the reasons for that contention—an express objection was not required. (*People v. Downey* (2000) 82 Cal.App.4th 899, 909, fn. 4 ["Given defense counsel's vigorous argument that the court should reinstate probation and not impose any other sentence, there was no waiver of this issue for purposes of appeal."]; *Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406–1407 [trial court "had the

34

benefit" of appellant's briefs, which "raised the points he asserts on appeal," and plainly rejected those arguments].) Thus, the issue is cognizable on appeal despite the lack of an express objection below. (*Ibid.*; accord, *People v. Sandoval* (2007) 41 Cal.4th 825, 837, fn. 4 (*Sandoval*) [objection would have been futile].)[8]

### 4.2. Legal Principles

California's Determinate Sentencing Law (DSL) specifies three possible terms of imprisonment for most offenses—a low term, a middle term, and an upper term. Before 2007, the middle term was the presumptive sentence: the court could impose the upper or lower term only if it found circumstances in aggravation or mitigation—and the court had to determine the facts supporting those circumstances by a preponderance of the evidence. (*Sandoval, supra*, 41 Cal.4th at p. 836.) Inexplicably, both defendant and the People base their arguments on this version of the DSL.

In *Cunningham*, the United States Supreme Court held that such judicial fact finding violated the Sixth Amendment. (*Cunningham v. California* (2007) 549 U.S. 270, 274, 281; see *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490; *Blakely v. Washington* (2004) 542 U.S. 296, 299, 303–304.) In response, the California Legislature did away with the midterm presumption and granted trial courts discretion to impose *any* of the three possible terms without engaging in additional fact finding. (See

---

[8] We note that even if defendant had forfeited the issue below, we would exercise our discretion to consider it on appeal to forestall a later claim of ineffective assistance of trial counsel. (*People v. Beltran, supra*, 82 Cal.App.4th at p. 697, fn. 5.)

Stats. 2007, ch. 3, § 1.) As amended, the DSL provides, "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. … The court shall select the term which, in the court's discretion, best serves the interests of justice. The court shall set forth on the record the reasons for imposing the term selected … ." (Pen. Code, § 1170, subd. (b).) Thus, under the amended DSL, though the court must "specify reasons for its sentencing decision," it is no longer "required to cite 'facts' that support its decision or to weigh aggravating and mitigating circumstances. [Citations.]" (*Sandoval, supra,* 41 Cal.4th at pp. 846–847.) Nor must the court's reasons be supported by a preponderance of the evidence.

Instead, in "exercising his or her discretion in selecting one of the three authorized terms of imprisonment referred to in section 1170(b), the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision. The relevant circumstances may be obtained from the case record, the probation officer's report, other reports and statements properly received, statements in aggravation or mitigation, and any evidence introduced at the sentencing hearing." (Cal. Rules of Court, rule 4.420(b).)

This "evaluation of the relative weight of aggravating and mitigating circumstances is not equivalent to a factual finding." (*People v. Black* (2007) 41 Cal.4th 799, 814, fn. 4.) As long as "a defendant is *eligible* for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles" (*id.* at p. 813), "a trial court is free to base an upper term sentence upon any aggravating circumstance that the court

36

deems significant, subject to specific prohibitions. [Citations.] The court's discretion to identify aggravating circumstances is otherwise limited only by the requirement that they be 'reasonably related to the decision being made.' [Citation.]" (*Sandoval*, *supra*, 41 Cal.4th at p. 848.)

### 4.3. The court did not abuse its discretion.

We review sentencing decisions for abuse of this broad discretion. (*Sandoval*, *supra*, 41 Cal.4th at p. 847.) "The trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.' [Citation.]" (*Ibid*.) To prevail on appeal, the party attacking the sentence must show the court's decision was irrational or arbitrary. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977–978; *People v. Giminez* (1975) 14 Cal.3d 68, 72.)

Here, the sentencing decision was neither irrational nor arbitrary. The court was statutorily permitted to sentence defendant to the high term. The trial court expressly recognized that authority, and on the record clearly weighed and delineated the reasons behind the sentence. (See *People v. Quintanilla* (2009) 170 Cal.App.4th 406.) For example, the court concluded that defendant displayed callous disregard for life when, as a law enforcement officer, he saw Jessica screaming inside a burning car yet failed to call 911; instead, he called his fiancée. (Cal. Rules of Court, rule 4.421(a)(1).) The court also emphasized that defendant's consistent failure—including at sentencing—to take responsibility for the crash, insistence on blaming Jessica for causing it, and adamance that he hadn't driven recklessly indicated that he had still not learned how to pass properly and

was likely to put the public in danger again in the future.[9] (*Id*., rules 4.408, 4.421(c).) Weighing against these factors—and others—the court considered defendant's sentencing materials and various mitigating circumstances such as his lack of a criminal record.

Defendant has not established that the court exceeded the bounds of reason in imposing the upper term.

## 5. Any error in assessing defendant's presumptive probation eligibility was harmless.

Defendant argues the matter must be remanded for resentencing because the court acted under the mistaken belief he was presumptively ineligible for probation. We need not reach that issue because any error was harmless.

Normally, "a discretionary sentencing decision rendered by a judge who did not understand what he [or she] was doing would not be sustainable as a proper exercise of discretion." (*In re Large* (2007) 41 Cal.4th 538, 550.) Here, however, the record affirmatively demonstrates that the court would not have granted probation even if it were aware of the full scope of its discretion. (*People v. McVey* (2018) 24 Cal.App.5th 405, 418; *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1092 [even assuming trial court erred in concluding defendant was statutorily ineligible for

---

[9] For instance, in his sentencing statement, defendant said "there was nothing on that road that day that showed that there was a problem for me to pass. Everything was fine." Also: "I wasn't driving reckless that night. It just happened," and he hoped Jessica and Carlos could "forgive me [for] anything that they believe I did." And, though he insisted, "I never blamed Jessica for crashing into me," he repeatedly emphasized that *she* hit *him*.

probation, denial of probation was not an abuse of discretion where court expressed other valid reasons for its choice].)

First, the court explained, "The court is aware … [that] under unusual circumstances, [the Penal Code] does permit the court to allow probation. I do not find this case [is] in any way, shape, or form the kind of case that the court would find an unusual circumstance. I'm making it abundantly clear. This is not a probationary [case] at this point, and I'll explain the purposes for my sentence in just a minute." The court's comments indicate not only that it did not believe this was an unusual case, but also that it did not believe probation would be appropriate under any circumstances—a view the court went on to explain in detail.

For example, when addressing defendant's decision to call his fiancée rather than 911, the court noted, "I realize there were other people there and you may not have been able to pull [Jessica] out of that [burning] car, but you made no effort to even move towards the car to try to help. And she could see you. There's no doubt in my mind that you could … see her. And she was screaming. And the … citizens there that came to her aid saw her and heard her, and they came to her aid. And the first thing you did was think about yourself by calling your girlfriend. That is [callous] disregard for human life, in my opinion. They're lucky they didn't die out there that night."

The court explained that while defendant saw himself as a victim, "You are not. You caused everything that night. You alone. Not Jessica. Not the roadway." Defendant's failure to acknowledge this fact told the court that "if you were in the same situation, you would do it again 'cause you still, as we sit here today, do not see that as reckless, sir. I don't know what you're

thinking. You absolutely made a conscious choice to drive into oncoming traffic." Moreover, "based on what the witnesses were saying, you had more than enough room to move back into your lane, and you chose not to. You decided to keep going. You almost killed this entire family."

The court described defendant's attitude throughout the trial as expressing "disgust" rather than "compassion," and concluded, "[a]sking for second chances, the difference is when you're done with your sentence, you will move on with your life. This family will forever suffer from your actions. I wish they had the opportunity just to ride it out for a couple of years and go on with their lives and have it all put back in place. They will not get that, and you will. [¶] So with respect to the sentencing, probation is hereby denied."

Second, as discussed, the court had the discretion to sentence defendant to 16 months, two years, or three years for count 1. In choosing to impose the high term, the court identified several aggravating factors, including defendant's failure to render aid, his lack of any remorse, and his consistent effort to blame Jessica for the crash.

"In light of the trial court's express consideration of the factors in aggravation and mitigation, its pointed comments on the record, and its deliberate choice of the highest possible term …, there appears no possibility that, if the case were remanded, the trial court would exercise its discretion" to grant probation in this case. (*People v. McVey*, *supra*, 24 Cal.App.5th at p. 419.) "We therefore conclude that remand in these circumstances would serve no purpose but to squander scarce judicial resources." (*Ibid*.)

## DISPOSITION

The judgment is affirmed.

## CERTIFIED FOR PARTIAL PUBLICATION

LAVIN, Acting P. J.

WE CONCUR:

EGERTON, J.

DHANIDINA, J.

41