Filed 3/28/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>MARIO GUADALUPE SERRANO,<br><br>    Defendant and Appellant. | A166011<br><br>(Contra Costa County<br> Super. Ct. No. 05-171324-7) |

This appeal addresses whether substantial evidence supports a jury's findings of premeditated and deliberate attempted murder where the defendant engages in a shootout with police immediately after crashing a stolen vehicle in a busy intersection, and whether a trial court has discretion to strike those findings pursuant to Penal Code section 1385, subdivision (c).[1] We answer the first question in the affirmative and the second in the negative.

Defendant Mario Guadalupe Serrano appeals from judgment after being convicted of 13 criminal counts, which included two counts of premeditated attempted murder of a peace officer. After the trial court dismissed five of the six firearm enhancements found true by the jury, it sentenced defendant to a total determinate term of 35 years 8 months and a total indeterminate term of 30 years to life.

---

[1] Unless otherwise stated, all statutory citations herein are to the Penal Code.

1

On appeal, defendant contends the jury's findings on counts 1 and 3, that he acted with premeditation and deliberation in committing attempted murder, are unsupported by sufficient evidence; the trial court failed to exercise its discretion to consider striking the premeditation and deliberation findings pursuant to section 1385, subdivision (c); and the trial court erroneously pronounced at the sentencing hearing that the 20-year sentence imposed for the firearm enhancement attached to his determinate term rather than his indeterminate term. Only defendant's last argument has merit. We thus issue a limited remand to permit the trial court to correct its sentencing error with respect to the 20-year firearm enhancement accompanying count 1 and otherwise affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

Following a three-day crime spree in May 2016 involving six separate incidents, defendant was charged by amended information with: two counts of attempted premeditated murder of a peace officer (counts 1 and 3; Pen. Code, §§ 187, subd. (a), 664, subds. (e), (f)); two counts of assault with a firearm upon a peace officer (counts 2 and 4; Pen. Code, § 245, subd. (d)(1)); felony vandalism by damaging and destroying property over $400 (count 5; Pen. Code, § 594, subd. (b)(1)); arson of property of another (count 6; Pen. Code, § 451, subd. (d)); first degree residential burglary (count 7; Pen. Code, § 459); grand theft firearm (count 8; Pen. Code, § 487, subd. (d)(2)); driving or taking a vehicle without consent (count 9; Veh. Code, § 10851, subd. (a)); two counts of shooting at an inhabited dwelling (counts 10 and 11; Pen. Code, § 246); carjacking (count 12; Pen. Code, § 215, subd. (a)); and fleeing a pursuing peace officer's motor vehicle while driving recklessly (count 13; Veh. Code, § 2800.2). As to counts 1 and 2, it was alleged defendant personally and intentionally discharged a shotgun, causing great bodily injury. Various

2

firearm enhancements were also alleged as to counts 3, 4, 12, and 13. Trial began on January 15, 2019.

## I. Trial.

### A. Vandalism: May 2, 2016 (Count 5).

Just before 5 p.m. on May 2, 2016, defendant opened the glass front doors of the fast food restaurant in Antioch where his girlfriend, Jane Doe, was employed. Defendant yelled something to the effect of, "This is for [Jane]," as he smashed both doors with a metal tire iron, shattering glass everywhere. The restaurant was forced to close for several hours and to pay about $2,000 in repairs.

Earlier that day, the couple returned from a trip to Southern California to visit defendant's daughter and other family members. During their trip, defendant repeatedly accused Jane of cheating on him and refused to leave her alone, even with his family present. When defendant dropped Jane off at work that morning for her early morning shift, he accused her of lying about having to work and refused to turn over her purse or keys.

Later, when Jane called defendant to bring her the purse and keys, he drove their shared car, a white Dodge Charger, to the restaurant; parked it in the drive-through lane; locked the doors; and left. Jane and her coworkers were forced to break the car window in order to move the car from the drive-through lane. A tow truck had to be called to move the car back to Jane's house, where she lived with defendant. Jane eventually walked home from the restaurant after work. She never spoke to defendant again and had the locks changed on her apartment because she was afraid.

### B. Arson: May 2, 2016 (Count 6).

Approximately 5 p.m. on May 2, 2016, the fire department responded to a report of a car fire in Pittsburg, less than two miles from the restaurant

3

where Jane worked. The responders found a white Dodge Charger registered to defendant and Jane ablaze. It appeared that the car had been abandoned and that brake lines and lines within the engine compartment had been cut. A blood droplet was found on the driver's side door, and there was a strong gasoline odor inside the passenger compartment although the gas tank was not damaged. Based on its investigation, the fire department determined the fire was intentionally set by igniting gasoline inside the passenger compartment.

### C. Residential Burglary: May 2–3, 2016 (Counts 7–9).

In May 2016, Kit S. lived in a rural area in Clayton. The weekend of May 1, 2016, she left town on a business trip. Her white Chevrolet truck was parked outside her house. She also had two guns, stored in a bedroom of her house.

On May 4, 2016, around 7:30 p.m., deputy sheriffs were dispatched to Kit's house to contact the owner of a vehicle that had been involved in a series of crimes. The deputies saw broken windows and a ladder leading to the balcony. They entered the house and found it ransacked. Pictures had been ripped off the walls, and there were piles of bullets around the house. Windows and a sliding door had been screwed shut and butcher knives placed by the windows. Furniture had been moved to impede access into and out of the house, and blood was everywhere.

After returning from her trip, Kit found a wallet in her house containing defendant's driver's license, Jane's debit card, an appointment reminder card with defendant's name on it, a pay stub, and a prom photograph of defendant. She also found that one shotgun and her white truck were missing.

4

### D. Shooting at an Inhabited Dwelling: May 4, 2016 (Counts 10–11).

On May 4, 2016, just before 11 a.m., defendant drove to the drive-through window of the fast food restaurant where Jane worked and asked the employee at the window whether Jane was there. Although the employee told him no three times, defendant pulled out a gun and asked to "come in to get her." The employee ran to hide, while telling a coemployee that defendant was outside with a gun. The pair ran with several other employees into the freezer, where they tried to call the police but did not have cellular reception.

While they hid, about four gunshots were fired into the restaurant's large-paned glass windows in front of an area designated as the children's play space. An employee who was between the restaurant's lobby and play space was hit on his cheeks and left pectoral with three "little balls" that caused markings and swelling. The physical evidence, including a shotgun cup and an expended shell, proved the shots came from a shotgun loaded with bird shot. Defendant was later identified in a dashboard camera video of the incident as the driver of a white truck.

Just after 11 a.m. on the same day, a neighbor of Jane's cousin was outside his house on Beacon Street in Pittsburg. The neighbor witnessed a man in a white truck pull up in front of Jane's cousin's house and exit the truck with a shotgun. This man, later identified as defendant, shouted "cabrón" and shot through the front window of Jane's cousin's house before returning to the truck and leaving.

### E. Carjacking: May 4, 2016 (Count 12).

In the early evening of May 4, 2016, T.L., a high school student, and several friends were "hanging out" in a rural area on Franklin Canyon Road, taking photographs. A white truck arrived and parked about 40 feet away.

Defendant got out of the truck and approached with a shotgun "in a ready position . . . ." Defendant asked T.L. for the keys to his 1997 BMW, and T.L. complied. Defendant warned the group not to call the police and said he would be back. He then drove off in the BMW toward the entrance of eastbound Highway 4. One of T.L.'s friends called 911.

The police arrived and searched the white truck that defendant left behind, finding several spent ammunition shells and rounds of live ammunition.

### F. Fleeing the Police, Assault with a Firearm, and Attempted Murder: May 4, 2016 (Counts 1-4, 13).

Around 6 p.m. on May 4, 2016, Officers Smith and Duggar of the Antioch Police Department were on patrol in separate marked police cars. Both officers responded to a report of defendant's driving a stolen BMW near Auto Center Drive and Pittsburg–Antioch Highway. Officer Smith, parked in an industrial lot, saw the stolen BMW with no license plates and began following it. Once Officer Duggar arrived, both officers activated their overhead lights.

Defendant sped up to 60 to 80 miles per hour as he drove erratically, southbound on Auto Center Drive. Although it was rush hour, defendant did not stop at a single red light as he entered Century Boulevard. At some point, Officer Smith lost sight of defendant. However, as he approached the intersection of Leland and Loveridge Roads, Officer Smith saw a light-colored Chevrolet Suburban in the middle of the intersection with major damage. The BMW had run the red light and collided with the Suburban and another car before colliding with some street signage and coming to a stop on the north side of the intersection. Officer Smith saw defendant standing outside the crashed BMW using the car door as concealment as he pointed a firearm in the officer's direction.

6

Officer Smith slammed on his brakes as he saw a muzzle blast from defendant's firearm. He immediately felt an impact to the side of his face that felt like "having a cinder block thrown at [him]." Officer Smith felt blood running down his face and thought he might lose consciousness. After hearing a second muzzle blast, Officer Smith returned fire on defendant with his pistol, shooting about three rounds through his own windshield. Officer Smith then opened his car door, put the car into drive, waited for a break in the gunfire, and ran toward the Suburban. Before he reached the vehicle, Officer Smith slipped and fell. As he got up, Officer Duggar arrived and got out of his car. Officer Duggar's car provided cover until both men could run behind the Suburban.

Similar to Officer Smith, when Officer Duggar arrived at the scene, he saw defendant standing over the doorframe of the stolen, crashed BMW with a "long rifle-style weapon" aimed in Officer Smith's direction. Officer Duggar saw at least one muzzle blast aimed at Officer Smith. Then Officer Duggar saw defendant pivot and point his gun at him, prompting Officer Duggar to slam on the brakes. As Officer Duggar attempted to put his car into park, he saw a second muzzle flash in his direction. He got out of the car as it continued to roll forward. Officer Duggar then joined Officer Smith behind the Suburban and fired at least two shots at defendant. After the officers did not hear any shots for several seconds, they approached defendant and were able to take him into custody.[2]

The police later recovered a Remington Model 870 Wingmaster shotgun, six shotgun shells (four fired and two unfired), and 13 expended

---

[2] Officer Smith received medical treatment for shotgun pellets that had "peppered" his head. As of trial, he still suffered chronic headaches and jaw disfunction.

handgun rounds. Defendant's crash and shootout with the police were memorialized in video footage from a municipal camera that was played at trial.

## II. *The Verdict, Sentencing and Appeal.*

On February 6, 2019, the jury found defendant guilty of all counts and found true all enhancement allegations with the following exception: As to counts 1 and 2, the jury found the great bodily injury allegation not true but found true the special allegation that defendant personally and intentionally discharged a firearm.

At the June 21, 2022, sentencing hearing, the trial court dismissed all firearm enhancements except for the 20-year firearm enhancement attached to count 1 pursuant to section 1385, subdivision (c). The court then sentenced defendant on counts 1 and 3 to two consecutive 15 years to life terms, totaling 30 years to life. With respect to the remaining counts and the firearm enhancement, defendant was sentenced to a total determinate term of 35 years 8 months. Defendant timely appealed.

## DISCUSSION

Defendant contends: (1) the evidence is insufficient to support the jury's finding beyond a reasonable doubt that he committed attempted murder with premeditation and deliberation; (2) the trial court failed to exercise its discretion to consider striking his premeditation and deliberation enhancements under section 1385, subdivision (c) (hereinafter, section 1385(c)); and (3) the trial court imposed an unauthorized sentence by incorrectly attaching the 20-year sentence for the firearm enhancement to defendant's determinate term rather than his indeterminate term. We address each contention in turn.

8

**I.**     *Evidence of Premeditation and Deliberation.*

Defendant paints his first challenge as a denial of due process, arguing that in the absence of "constitutionally sufficient evidence" of premeditation and deliberation, his convictions on counts 1 and 3 cannot stand.

The standard of review when a criminal defendant challenges the sufficiency of evidence is well established. "In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] . . . 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' [Citations.] 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

In conducting this review, "[w]e focus ' "on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " ' [Citation.] ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' [Citations.] Instead, reversal is required only if ' "it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " ' [Citation.] [¶] Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1019–1020.)

Relevant to this evidentiary challenge, the requisite state of mind for premeditation and deliberation " 'is uniquely subjective and personal.  It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death.' (*People v. Chiu* (2014) 59 Cal.4th 155, 166 [citations].)  '[T]he reflection necessary to establish premeditation and deliberation is not measured by duration of time: "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides . . . which are the result of mere unconsidered or rash impulse hastily executed." ' [Citation.]" (*People v. Wear, supra*, 44 Cal.App.5th at pp. 1020–1021; see *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462–1463, fn. 8, disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 198–199 [substantial evidence review of premeditation and deliberation is the same for murder and attempted murder].)

Defendant contends there was insufficient evidence supporting the findings of premeditation and deliberation because all three categories of evidence set forth in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*) were absent.  "In *Anderson*, we 'identified three categories of evidence relevant to resolving the issue of premeditation and deliberation:  planning activity, motive, and manner of killing.' [Citation.]  'However, these factors are not exclusive, nor are they invariably determinative.' [Citation.]  ' "*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.  [Citation.]" '

[Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 242.) We consider these categories to the extent they are relevant in this case.

Beginning with the manner of the shooting, Officer Smith was the first officer to arrive at the scene after defendant, driving a stolen BMW, crashed through a busy intersection during rush hour. Officer Smith testified that he saw defendant outside the BMW with a rifle or a shotgun perched over the top of the car, using the door as concealment. Officer Smith could see the gun's barrel. He then heard a loud bang and saw a muzzle flash just before something impacted the left side of his face that felt like being hit with a cinder block.

When Officer Duggar arrived, shortly after Officer Smith, he saw Officer Smith's patrol car on the north side of the intersection and defendant, poised at the doorframe of the BMW, pointing a long rifle-style weapon in Officer Smith's direction. Officer Duggar saw at least one muzzle blast aimed at Officer Smith before he saw defendant pivot around and point his gun at Officer Duggar. Officer Duggar slammed on his brakes and was attempting to put his patrol car in park when he saw a second muzzle flash in his direction. He left his car and moved behind a Suburban, where he and Officer Smith fired multiple shots at defendant and were eventually able to approach defendant and take him into custody.

Several other eyewitnesses also testified. Timothy W. was in the left turn lane when the stolen BMW pushed into a car that then pushed into his car after first hitting the Suburban. According to Timothy, defendant got out of the BMW after the crash, looked at Timothy and the person next to him, reached back into the BMW, and retrieved a gun. Defendant then held the gun over the BMW's roof and shot the first police car to arrive at the intersection through the driver's side window. As Timothy watched,

11

defendant then turned his body to shoot toward a second officer who arrived shortly after the first officer. Consistent with Timothy's testimony, Kyle M. saw defendant get out of his car and look around before returning to his car to grab a gun. And Greg T. saw defendant aim his gun at multiple police cars, shooting in one direction before shooting across the street in the other direction.

Physical evidence presented at trial supported the witness testimony. Both officers' cars sustained pellet damage from the shells fired from defendant's shotgun, which contained bird shot. Officer Smith's car had pellet damage to the driver's side door and mirror, as well as a broken driver's side window. Officer Duggar's car had pellet damage to the windshield, front hood, and left side bumper. The shotgun that defendant fired was a "pump-action" gun, meaning that after a shot was fired, the gun would have to be racked from the front and back to cycle another shot shell into the chamber for firing. Four fired shotgun shells were recovered from the scene after the shooting ended.

Based on this evidence, the jury could reasonably have inferred that defendant racked his shotgun from front to back at least four times as he took aim and fired, first at Officer Smith and then at Officer Duggar, a methodical process requiring " ' "careful thought and weighing of considerations for and against the proposed course of action" ' "—the very hallmarks of premeditation and deliberation. (*People v. Lee* (2011) 51 Cal.4th 620, 636.) In fact, it is difficult to imagine a scenario where a defendant repeatedly racks a firearm to prepare a shell for firing, takes aim, and then fires toward two people *without* harboring the intent to kill them. (See *ibid.* ["After [defendant's friend] fired a few shots from the gun at the first lookout, defendant reloaded the gun, supporting an inference that he had brought

12

extra ammunition as well"]; see also *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [where the defendant carried the fatal knife into the victim's home, it was " 'reasonable to infer that he considered the possibility of homicide from the outset' "]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1225 [" 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill" ' "].)

While nothing more is required to affirm the jury's findings (*People v. Streeter, supra*, 54 Cal.4th at p. 242), we nonetheless briefly touch on another *Anderson* consideration: evidence of planning. (*Streeter*, at p. 242.) As the People note, when the deputies entered Kit S.'s house to investigate defendant's criminal activity, they found it ransacked, with windows and doors screwed shut and knives and piles of bullets placed strategically around the house. The furniture had also been moved in such a way to prevent people from easily maneuvering into or around the house. Based on this evidence, the jury could reasonably have inferred that defendant had affected a plan to conceal himself with the weapons required to attack or defend himself effectively should the police or anyone else try to approach him. In other words, the evidence supports a reasonable inference that defendant had no intent to run away or peacefully surrender to police; rather, he intended to shoot to kill to avoid capture. (See *People v. Lee, supra*, 51 Cal.4th at p. 636 [upholding premeditation finding where, inter alia, defendant brought a loaded handgun with him on the night [of the killing], indicating he had considered the possibility of a violent encounter"].)

Thus, for the reasons stated, we conclude there was sufficient evidence from which the jury could have found defendant guilty of premeditated attempted murder of two peace officers beyond a reasonable doubt.

13

## II. *Exercise of Discretion Under Section 1385(c).*

Defendant next argues the trial court erred by failing to exercise its discretion under section 1385(c) to consider striking the jury's premeditation and deliberation findings. Defendant concedes the court invoked section 1385(c) to dismiss five of the six firearm enhancements, yet he insists the court was unaware this provision also afforded it discretion to dismiss the premeditation and deliberation findings.

The People respond that section 1385(c) does not apply to premeditation and deliberation findings because they are not enhancements. We agree.

Section 1385(c) provides in relevant part: "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others. . . ."[3] (§ 1385, subd. (c)(1)–(2).)

---

[3] The California Supreme Court has granted review to consider whether section 1385(c)'s mandate that trial courts afford great weight to enumerated mitigating circumstances (Stats. 2021, ch. 721) creates a rebuttable presumption in favor of dismissing an enhancement unless the trial court finds dismissal would endanger public safety. (*People v. Walker* (2022) 86 Cal.App.5th 386, review granted Mar. 22, 2023, S278309.)

14

Here, the trial court found at least three mitigating circumstances in dismissing all but one firearm enhancement: (1) the charged enhancements could result in a sentence exceeding 20 years; (2) the current offense was connected to defendant's childhood trauma; and (3) the current offense was also connected to his mental illness. (§ 1385, subd. (c)(2)(C)–(E).) Nothing in the record reflects, however, that the court considered dismissing the jury's premeditation and deliberation findings based on these mitigating circumstances. This was not error, as the statute did not require it.

Defendant's contrary argument hinges on his claim that the allegations of premeditation and deliberation accompanying the attempted murder counts constitute "enhancement[s]" within the meaning of section 1385(c). We conclude the plain language of section 1385(c) does not support his claim.

Whether section 1385(c) applies to a finding of premeditation and deliberation is a question of statutory interpretation reviewed de novo on appeal. (*People v. Tirado* (2022) 12 Cal.5th 688, 694.) " 'Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them their usual and ordinary meaning. [Citation.] The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' [Citations.] If the words in the statute do not, by themselves, provide a reliable indicator of legislative intent, '[s]tatutory ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes.' . . . If the statute is ambiguous, we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy." (*People v. Arias* (2008) 49 Cal.4th 169, 177.)

Turning to the statute at hand, "[s]ubdivision (c) of section 1385 expressly applies to the dismissal of an 'enhancement.' (§ 1385, subd. (c)(1).) 'Ordinarily words used in a statute are presumed to be used in accordance with their established legal or technical meaning.' [Citation.] The term 'enhancement' has a well-established technical meaning in California law. ([*People v. Superior Court (Romero)* (1996)] 13 Cal.4th [497,] 526–527.) 'A sentence enhancement is "an additional term of imprisonment added to the base term." ' (*People v. Jefferson* (1999) 21 Cal.4th 86, 101 [citations], italics omitted; [citations].)" (*People v. Burke* (2023) 89 Cal.App.5th 237, 243 (*Burke*).)

Our appellate courts have routinely rejected the argument that the "Three Strikes" law constitutes an enhancement under section 1385(c), concluding it is "well established" that the law is instead "an alternative sentencing scheme for the current offense." (*Burke, supra*, 89 Cal.App.5th at p. 243; *People v. Dain* (2024) 99 Cal.App.5th 399, 410 (*Dain*).) In reaching this conclusion, these courts have "presume[d] the Legislature was aware of, and acquiesced in, both this established judicial definition of enhancement and the distinction between an enhancement and an alternative sentencing scheme such as the Three Strikes law. [Citation.] The Legislature did not otherwise define the word 'enhancement' in section 1385." (*Burke, supra*, at p. 243; *Dain, supra*, at pp. 410–411.) Yet, "[i]f the Legislature had wanted section 1385, subdivision (c) to apply to prior strikes as well as to enhancements as legally defined, it would have said so." (*People v. Olay* (2023) 98 Cal.App.5th 60, 67 (*Olay*).)

We conclude this same reasoning applies to premeditation and deliberation findings.[4] To begin, defendant received two indeterminate terms of 15 years to life, one for each count of premeditated and deliberate attempted murder of a peace officer. This sentence was imposed pursuant to sections 187, subdivision (a), and 664. Relevant here, section 664, subdivision (e) provides: "Notwithstanding subdivision (a),[5] if attempted

---

[4] Our colleagues based their conclusion that section 1385(c) does not apply to alternative penalty schemes such as the Three Strikes law on the plain and unambiguous language of section 1385(c), which limits the court's discretion to the dismissal of an "enhancement." As such, they saw no need to consider the legislative history. (*Burke, supra*, 89 Cal.App.5th at p. 244; *Dain, supra*, 99 Cal.App.5th at pp. 410–411.) Nonetheless, this division of the First Appellate District in *Olay* examined the legislative history and found further support for this conclusion: "The June 2021 bill analysis of Senate Bill 81 by the Assembly Committee on Public Safety distinguished an 'enhancement' from 'an alternative penalty scheme' like the Three Strikes law. (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 81, *supra*, as amended Apr. 27, 2021, at pp. 5–6, citing Cal. Rules of Court, rule 4.405(3), *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 898–899 [citations], and *People v. Jefferson* (1999) 21 Cal.4th 86, 101 [citations].) After making that distinction, the bill analysis states, in no uncertain terms, that '[t]he presumption created by this bill applies to enhancements . . . *but does not encompass alternative penalty schemes*.' (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 81, *supra*, as amended Apr. 27, 2021, at p. 6, italics added.) A more unambiguous statement of the Legislature's intent to adopt the legal meaning of enhancement for section 1385, subdivision (c) can hardly be imagined." (*Olay, supra*, 98 Cal.App.5th at p. 67.) Although we agree resort to legislative history is not required, we find this analysis persuasive.

[5] Section 664, subdivision (a) provides in relevant part that "if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. . . . The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact."

murder is committed upon a peace officer . . . , and the person who commits the offense knows or reasonably should know that the victim is a peace officer . . . , the person guilty of the attempt shall be punished by imprisonment in the state prison for life with the possibility of parole." (§ 664, subd. (e).)  However, "if the elements of subdivision (e) are proven in an attempted murder and it is also charged and admitted or found to be true by the trier of fact that the attempted murder was willful, deliberate, and premeditated, the person guilty of the attempt shall be punished by imprisonment in the state prison for 15 years to life."  (§ 664, subd. (f).)

Section 664, subdivisions (e) and (f) provide alternative penalty provisions depending on whether the underlying offense of attempted murder of a peace officer was committed with premeditation and deliberation.  As explained in *People v. Bright* (1996) 12 Cal.4th 652, in discussing a comparable provision, "section 664, subdivision (a), prescribing a punishment of life imprisonment with the possibility of parole for an attempt to commit murder that is 'willful, deliberate, and premeditated' does not establish a greater degree of attempted murder but, rather, sets forth a *penalty provision* prescribing an increased sentence (a greater base term) to be imposed upon a defendant's conviction of attempted murder when the additional specified circumstances are found true by the trier of fact." (*Bright, supra*, at p. 669, disapproved on another ground in *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6.)

In harmony with *Bright*, the California Supreme Court, in *People v. Jones* (2009) 47 Cal.4th 566 (*Jones*), elucidated that certain statutes (including § 186.22, subd. (b)(4)) set forth an alternative penalty provision for the underlying felony that is distinct from providing a sentence enhancement as punishment in addition to the base term imposed for a felony:  "The

18

difference between the two is subtle but significant. 'Unlike an enhancement, which provides for an *additional term* of imprisonment, [a penalty provision] sets forth an alternate penalty *for the underlying felony itself*, when the jury has determined that the defendant has satisfied the conditions specified in the statute.' [Citations.]" (*Jones, supra*, at p. 578.) "It usually does so either by allowing a misdemeanor to be punished as a felony under the determinate sentencing law (DSL) or[, as here,] by removing a crime *from* the DSL and bringing it under an alternative sentencing scheme such as the 'Three Strikes' law. Thus, we can most easily identify a penalty provision by contrast to what it is not: an enhancement or a substantive offense." (*People v. Escarega* (2019) 32 Cal.App.5th 362, 376.)

Based on this authority, we interpret section 664, subdivisions (a), (e) and (f) as providing alternative penalties for the offenses of attempted murder and attempted murder of a peace officer committed with premeditation and deliberation rather than enhancements. As such, section 1385(c) did not afford the trial court discretion to dismiss the jury's premeditation and deliberation findings based on the evidence of defendant's mitigating circumstances. Had the Legislature wanted section 1385(c) to apply to premeditation findings as well as to enhancements as legally defined, it would have said so. (*Olay, supra*, 98 Cal.App.5th at p. 67; see *People v. Brookfield* (2009) 47 Cal.4th 583, 593–595 [noting the court's recent trend in drawing a "strict distinction . . . between sentence enhancements and penalty provisions" and calling on "the Legislature . . .to consider [this distinction] in any future legislation on the subject"].) Defendant's argument thus fails.

19

## III. *Unauthorized Sentence: Count 1 Enhancement.*

Lastly, the parties agree the trial court erred in orally pronouncing that the 20-year sentence imposed for the firearm enhancement accompanying count 1 attached to defendant's determinate term. (See § 12022.53, subd. (c) ["a person who, in the commission of [an enumerated felony], personally and intentionally discharges a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 20 years"].) We also agree.

At the sentencing hearing, the court imposed an indeterminate term of 30 years to life for counts 1 and 3. The court also imposed a consecutive determinate term of 35 years 8 months, a total term that included the 20-year term for the firearm enhancement that accompanied count 1. In the abstract of judgment, however, this 20-year term is attached to defendant's indeterminate sentence of 30 years to life. As such, the abstract of judgment specifies a total determinate term of 15 years 8 months and a total indeterminate term of 30 years to life plus 20 years.

The abstract of judgment is correct since the firearm enhancement is attached to defendant's indeterminate term for count 1. The oral pronouncement, to the contrary, is incorrect to the extent it attaches the firearm enhancement to defendant's determinate term. Thus, because when, as here, a discrepancy exists between the oral pronouncement of judgment and the abstract of judgment, the oral pronouncement ordinarily controls (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–186), we will order a limited remand to permit the trial court to clarify for the record that the 20-year term for the firearm enhancement is attached to defendant's indeterminate term.

20

## DISPOSITION

This matter is remanded to the trial court for the limited purpose of correcting the record to reflect that the 20-year sentence for the firearm enhancement accompanying count 1 is attached to defendant's indeterminate term and not his determinate term. In all other regards, the judgment is affirmed.


Jackson, P. J.

WE CONCUR:

Simons, J.
Burns, J.

A166011/*People v. Mario Guadalupe Serrano*

21

A166011/People v. Mario Guadalupe Serrano

Trial Court:        Superior Court of the County of Contra Costa

Trial Judge:       Nancy Davis Stark

Counsel:           Eric Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

                     Rob Bonta, Attorney General, Lance E. Winters and Susan Sullivan Pithey, Assistant Attorneys General, Steven D. Matthews and Amanda V. Lopez, Deputy Attorneys General, for Plaintiff and Respondent.